The Wickes Corporation, a Delaware corporation, appellee, v. Kenneth Frye, doing business as Interior Designers, appellee, Impleaded with Loyd Reisig et al., appellants, Impleaded with Pine Tree Builders, a partnership, et al., appellees.

273 N. W. 2d 663

Filed January 3, 1979.   No. 41779.

Wright & Simmons and John A. Selzer, for appellants.

J. L. Zimmerman of Atkins, Ferguson, Hahn & Zimmerman, for appellee Wickes.

Heard before Spencer, C. J., Pro Tem., Boslaugh, McCown, Clinton, Brodkey, and White, JJ., and Kuns, Retired District Judge.

Spencer, C. J., Pro Tem.

This is an action to foreclose a mechanic's lien. The District Court found in favor of The Wickes Cor-

poration and entered a decree of foreclosure. The homeowners, Loyd Reisig and Ruth B. Reisig, filed this appeal. Loyd Reisig died November 2, 1978, and his interest is represented on appeal by his wife as the personal representative of his estate. Defendants contend plaintiff did not establish its lien and in any event should be estopped from enforcing it. We affirm the judgment of the District Court.

The mechanic's lien was filed November 13, 1975, in the amount of $2,003.33. This figure represents the purchase price of sheetrock, casement windows, and a patio door, allegedly incorporated into the house. The materials which are the subject of the lien were ordered from plaintiff's Fort Collins, Colorado yard by Kenneth A. Frye, the general contractor. They were shipped from Fort Collins and delivered on August 22, 1975. Defendants were informed by Frye on November 24, 1975, that plaintiff had filed a lien against their property. Frye did not complete the contract.

As a result of a meeting held on November 24, 1975, between Frye and Loyd Reisig, a mutual release was executed. Part of this release agreement required Reisig to satisfy the mechanic's lien which had been filed by Wickes. Frye left town in December 1975, without performing any of the obligations contained in the release.

Michael Webb, a contractor associated with Pine Tree Builders, testified his company subcontracted with Frye to do part of the work on the house. Frye was responsible for providing the materials and Webb suggested he purchase the materials from Wickes Lumber Company in Fort Collins, Colorado. Webb was present at a building project in Henry, Nebraska when a truck arrived loaded with shake shingles, sheetrock, and windows. He stated he did not remember who provided the truck although he referred to it once as the Wickes' truck after plaintiff's counsel referred to it as such. Two of his em-

ployees unloaded some of the shake shingles in Henry and then accompanied the truck to the Reisig house. The next day Webb observed shingles, sheetrock, and windows in the front of the Reisig house. On his next visit to the house the drywall work had been completed.

Webb's company was not paid for its work on the house and it filed a mechanic's lien. At the end of November or the first part of December, after the lien had been filed, Webb received a call from Loyd Reisig. Reisig promised to pay the amount owing if Pine Tree Builders would perform some extra work. Webb agreed. Part of the work was to set the windows, which was done shortly after the telephone conversation. Webb did not measure the windows but he knew they were casement windows. He stated, "As far as I know they came off of the Wickes' truck." One of the windows was not installed because it was broken. Pine Tree Builders was paid for its work.

Loyd Reisig testified he and his wife contracted with Frye for the construction of their home. The contract called for a 10 percent downpayment with progress payments to be made as follows: 15 percent upon the completion of footing and foundation work; 20 percent upon completion of framing; 20 percent upon completion of drywall work; 15 percent upon completion of all interior and exterior carpenter work; and the balance upon taking possession. The total contract price was $41,000. Reisig made the downpayment and the first two progress payments for a total of $18,450. The last check to Frye was written on August 5, 1975. Reisig testified he considered this last check, in the amount of $8,200, as covering the next purchases to be made by Frye, including the sheetrock and the windows.

Frye stopped work on the project in early September 1975. Reisig testified he had no idea where Frye was purchasing materials during the period of con-

struction from May to August. He further stated he was not present when any of the materials were delivered to the construction site except for one occasion when the trusses and asbestos shingles were unloaded. Later in his testimony he stated Frye told him before the windows were delivered that they had been ordered from Wickes and he showed him a copy of the invoice. The invoice indicated the transaction was to be C.O.D. Frye told him, "I have to pay for them before they're unloaded." Following delivery of the windows, Frye told Reisig they had been paid for and showed him a check stub. Reisig thought he was shown the check stub the day after delivery.

Reisig testified he became aware 2 or 3 weeks after construction started that Frye had not obtained a performance bond as required by the contract. He stated because of this knowledge, "I would check if a truck would come or a driver would come like a C.O.D. that Frye would show me from Wickes on the windows I checked that with him and that is what I used as a sure thing that Frye would have to pay for them was the C.O.D.'s." He testified he would not have let the windows be unloaded had he known they were not paid for, or else he would have stopped construction until payment was made. He also would have inventoried the materials which were unloaded and those which were removed by Frye to another location.

Reisig testified he learned about the 20th of September that the windows and others items from Wickes had not been paid for, when he called Wickes or Wickes called him concerning the shake shingles which had been delivered, but which were supposed to have been delivered to another house Frye was building. Reisig at this time was told there was an outstanding bill in an amount over $2,000.

Reisig was asked to examine the copies of the invoices attached to the mechanic's lien filed by

Wickes. He testified a patio door and casement windows had been installed in his residence. Two windows which had been delivered were not installed because one was broken and the other was not meant for his house. Sheetrock was also used in the construction of his house. After stating Frye had told him the windows were ordered from Wickes, Reisig was asked whether there were other materials which had come from Wickes. He replied, "I think there was. I think the trucks come from Wickes. I'm not sure." Reisig testified that several times Frye removed materials which had originally been delivered to his property.

Jimmy Pask, the manager of Wickes Lumber Company in Fort Collins, testified he met Frye in July 1975, when he came in with Mike Webb for material to build a home in Nebraska. To the best of his knowledge, all the materials ordered by Frye were to be used in the construction of a house for a Lee Schwartzkopf. In early September 1975, he learned for the first time that some of the materials had gone to Reisig. This was when Reisig telephoned to complain that one of the windows which had been delivered was broken and another was the wrong size. He checked into the matter and returned Reisig's call on September 15, 1975. During this conversation he informed Reisig that the sheetrock, the windows, and the shake shingles delivered to him had not been paid for. Pask told Reisig he would order new windows when the correct sizes were determined. Reisig said he would call back with the measurements and later come in to pick up the windows in Fort Collins. Pask testified that during this same conversation they discussed the drywall and cedar shake shingles that were delivered to the Reisig house. Reisig told him they were going to use the drywall but the shakes did not belong to him, and per his attorney's intructions he was going to put them in the shed. Reisig called the Wickes yard

on September 20 when two men came to pick up the shake shingles to deliver them to the Schwartzkopf residence. Pask called back to assure him he would be held harmless on any mechanic's lien for the shake shingles if he would release them to the two men. Pask called Reisig on October 1 to confirm that the shake shingles had been picked up. At this time they also discussed whether Reisig was coming in to pick up the windows. Reisig told him to contact his attorney.

Pask testified about the copies of the invoices which were attached to the mechanic's lien. Two different forms were used. One of these forms served as both a purchase order and an invoice, and was used by Wickes when it had to special order the merchandise from other companies. This type of form contained one original and six carbon copies, which form was used for the casement windows and patio door. The other type of form, consisting of five copies, was labeled "Invoice" and was used by Wickes when it had a product on hand. The order for the sheetrock was placed on this type of form.

The purchase order date on the form for the windows and patio door was July 17, 1975. The merchandise arrived at Wickes in Fort Collins on August 19. The column for the product description contained the words "casement" and "patio door." The total amount for these items is $1,448.93. The name "Risick" appears at the top of the form. Pask testified he wrote this on the form after talking with Reisig and learning the materials had been delivered to him. The form does not show a delivery date. Under "type of sale" both cash and C.O.D. have been checked.

Frye is listed as the customer on the second form. Pask wrote "Risick" at the top of the form after talking with Reisig. The date shown on that form is August 21, 1975. Under the heading "delivery and time" appears the date "8/22/75." There is no sig-

nature showing receipt of the goods. Included in the description of materials are 220 sheets of "gyp board." The price of this material is stated to be $554.40. The name "Risick" appears between the description and the price. The names "Swartzcoff" and "Frye" appear after the other material which was ordered on the same form, including the shake shingles. Pask testified these names were placed after the product descriptions following a conversation with Frye's attorney in September 1975, or thereafter. Under the heading "special instructions" is the entry "include windows." Under "type of sale" an "X" appears in the box labeled "C.O.D." It appears there may also have been an "X" in the box labeled "charge," but this has been scratched out. The designation "chg" appears twice in large letters across the face of the document. The two amounts, $1,448.93 and $554.40, total $2,003.33, the amount of the lien.

Pask testified he had personal knowledge that all of the materials listed on these two documents were shipped out on the same truck, which belonged to Wickes, on August 22, 1975. He described the company policy with regard to the terms of payment as follows: "Whenever we have a builder — and the C.O.D. is in reference to this — whenever we have a builder, especially out of state, and we have to run credit information on him normally what I do is call the lender to determine that there is funding and that there is a job going that they say there is. Once that requirement is made by me then I release the materials on a Code 88, 88L, 85 which is a C.O.D. account in our books, which allows materials to leave the center and then at the end of the day that account is actually put in a charge status. It is only an account that we use to release materials out."

Pask called Nebraska Security Bank and learned that Frye had an account for the construction of Lee Schwartzkopf's home. He then OK'd the release of

the materials. When asked if he knew how the letters "chg" had gotten on the invoice, he stated, "Yes, after the paperwork gets back into the yard, which is normally the following day, and our accounting system just changes it to a charge and writes across the face of it and that account then goes to a charge status."

In support of Reisig's contention that he viewed copies of invoices prior to delivery of material from Wickes, exhibits 8 and 9 were introduced. Exhibit 8 is a customer copy of an invoice for 12 trusses, signed by Ken Frye. The date is shown as July 17, 1975. The type of sale is marked "C.O.D." and "C.O.D." appears across the face of the document in large letters. Reisig testified Frye told him these trusses had been used in the construction of his house. Exhibit 9 is a customer copy of a combination purchase order and invoice. Most of the document is illegible. The purchase order date is July 10, 1975. Under "type of sale" an "X" appears in the "C.O.D." box, and scratch marks appear in the "charge" box. However, neither of these invoices is included in the mechanic's lien being foreclosed. Reisig testified Frye gave him these documents in September 1975, although they had been shown to him earlier.

Pask testified the trusses described in exhibit 8 were delivered to and paid for by Lee Schwartzkopf. He did not know what exhibit 9 pertained to, but the code numbers indicated it was also an order for trusses. Disputing Reisig's testimony that he had seen a copy of the invoice for the windows prior to delivery, Pask testified the forms used by Wickes are such that the customer copy is not given to the purchaser until the goods are delivered.

Wickes denied the following request for admission: "All items sold by Plaintiff to Frye on which a lien is claimed by Plaintiff upon the premises of these Defendants, were sold C.O.D." In explaining

its denial, Wickes answered: "It was originally discussed and agreed when Frye initially contacted Plaintiff, that all deliveries would be made C.O.D., however, when the delivery to the Reisig residence made on August 22, 1975, was made, and Mr. Frye was not found on the premises, because of the past payment record that they had with Frye, Plaintiff decided to go ahead and drop the materials instead of taking them back to Colorado."

We first consider the question of estoppel. Defendants assert plaintiff is estopped to assert a mechanic's lien against the Reisig property because invoices shown to Reisig indicated Wickes' dealings with Frye were C.O.D. Reisig argues if he had known that was not the situation, he then could have protected himself by not accepting delivery of the materials, or by stopping construction, until Frye paid for the materials. Defendants argue the reason Reisig did not know the facts in time was because plaintiff had put into Frye's hands an invoice showing a C.O.D. sale which provided the means of deceiving Reisig. There were no representations made to Reisig by Wickes. Reisig is relying entirely on statements by Frye concerning the invoices. None of the materials shown on exhibits 8 and 9 are included in the lien filed herein.

The course of dealing between Frye and Wickes was such that it would be highly unlikely Reisig could have seen the invoice for the material included in the lien prior to the delivery of the material. In any event, Wickes explained the C.O.D. terminology and why the lien materials were delivered without receiving payment.

The intent of the lien law is to protect the materialman. The law puts the burden on the owner at his own risk to make certain that payment has been made for all materials delivered to the job. It is not enough to ascertain that some of the bills were paid. Nor is the fact that some of the items may have been

sold C.O.D. sufficient to create an estoppel. The homeowner still has the burden to ascertain whether payment has been made for all materials delivered to the premises.

If it is the position of the defendants that Reisig was an innocent party in this transaction, who relied upon an instrument negligently furnished by Wickes to the contractor, they are still without remedy herein. First, assuming Reisig saw the C.O.D. instrument before the delivery of the materials, was it reasonable for him to place any reliance upon the assurances made by Frye? He testified he knew 2 or 3 weeks after construction started that Frye had not obtained a performance bond. If he was seriously concerned about Frye paying for the materials, other precautions should have been taken. We also note that Reisig testified it was customary for him to pay Frye for materials before they were delivered to the premises or incorporated in the house. His testimony is that the payment of August 5 was to include the materials furnished by Wickes on August 22. It tests credulity to believe Reisig would engage in this course of dealings when Frye was unable to furnish a performance bond. This is particularly true when we consider the fact that Reisig was obligated to make the August 5 payment under the terms of the contract for the work performed to that date. The materials included in the lien would be included in the work covered by the next payment due under the contract.

The fact that Wickes decided to leave the materials on August 22 when Frye could not be found at the building site does not in any way change the law or create an equitable estoppel. In every such situation the supplier has a statutory right to rely on his lien if he decides to extend credit at that time.

After Reisig learned in early September that the materials had not been paid for, he executed a mutual release with Frye and arranged with Webb to

have the windows installed. Under the terms of the release, Reisig agreed to pay for the materials in consideration of Frye completing certain work on the house. The loss to defendants was occasioned by Frye leaving town in December without performing the work called for in the release. Under the circumstances of this case, even if the defendants' argument had merit, there is no way to hold that their loss should be shifted to Wickes.

The remaining issue presented for review is whether Wickes sustained its burden of proving it actually furnished the materials used in the construction of the Reisig house. The rule to be applied is: "The lien of a materialman for materials furnished for the erection of a building, by virtue of an agreement with the contractor, extends to such materials only as are used in *or* delivered at the building for use therein." (Emphasis supplied.) Occidental S. & L. Assn. v. Cannon, 184 Neb. 659, 171 N. W. 2d 166 (1969).

Reisig acknowledged that casement windows, a patio door, and sheetrock went into the building of the house. Webb had observed the sheetrock and windows in front of the Reisig house. He had also set the casement windows and hung the door. Pask testified that the items in the lien were all delivered to the premises at the same time. Wickes was only required to prove the materials had been delivered to the premises. The evidence is sufficient for this purpose. In a trial de novo this court, in reaching its own findings, will give weight to the fact that the trial court observed the witnesses and their manner of testifying and accepted one version of the facts rather than the opposite. Menke v. Foote, 199 Neb. 800, 261 N. W. 2d 635 (1978).

The judgment of the trial court is affirmed.

AFFIRMED.